In re:                                    )
MICHAEL MESSICK and SHEILA                )
MESSICK,                                  )        Case No. 4:09-cv-59
                                          )        Judge Mattice
    *Appellants/Debtors,*             )
                                          )
v.                                        )        On appeal from:
                                          )        EDTN Bankruptcy Ct.
ASCEND FEDERAL CREDIT UNION and           )        Case No. 08-14379
LAURA WILLIAMS,                           )        Judge Cook
                                          )
    *Appellees.*                      )

## MEMORANDUM AND ORDER

Appellants Michael Messick and Sheila Messick appeal, pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001(a), the order of the bankruptcy court entered on April 7, 2009 denying the Motion of Debtors to Hold Laura Williams and Ascend Federal Credit Union in Contempt of Court for Violation of Title 11 USC § 362 Automatic Stay [Court Doc. 1-7].

For the reasons stated below, the Court concludes that the bankruptcy court did not err and its ruling will be **AFFIRMED**.

## I.    STANDARD OF REVIEW

In an appeal from a bankruptcy court, the Court must uphold the findings of fact made by the bankruptcy court unless such findings are clearly erroneous. *Stamper v. United States (In re Gardner)*, 360 F.3d 551, 557 (6th Cir. 2004); Fed. R. Bankr. P. 8013. The Court reviews *de novo* the bankruptcy court's conclusions of law. *Gardner*, 360 F.3d at 557; Fed. R. Bankr. P. 8013. The Court has the authority to affirm, modify, or reverse a judgment or order of the bankruptcy court, and also may remand the case to the

bankruptcy court for further proceedings. Fed. R. Bankr. P. 8013.

## II.   FACTS AND PROCEDURAL HISTORY

Michael Messick and Sheila Messick ("Appellants" or "Debtors") filed a voluntary petition for Chapter 13 bankruptcy on August 26, 2008. (Court Doc. 1-4.) In this petition, Appellants listed a checking/savings account with Ascend Federal Credit Union ("Ascend") with a value of $1,283.45 as joint property. (*Id.* at 19.) Mrs. Messick also had a personal savings account with Ascend, and Mrs. Messick was the named custodian on two Ascend accounts for their two children. (Court Doc. 6, Tr. at 26.) In the list of unsecured nonpriority claims on the petition, Appellants included a debt to Ascend. (Court Doc. 1-4 at 29.) This debt was incurred by Mrs. Messick, and these unsecured nonpriority claims were scheduled to be paid at 100%. (Court Doc. 1-6 at 2.) Ascend filed a proof of claim in the amount of $946.52, which included interest up to the date of the petition.

Appellants received three letters from Ascend dated October 1, 2008, and two of the letters are in the record on appeal. (Court Docs. 1-9 & 1-10.) One of these two letters is directed to Mrs. Messick for her personal savings account and the other letter is directed to her as custodian of accounts for their two children. (*Id.*) These letters explained that credit union members who caused a loss are subject to revocation of their member privileges. (*Id.*) Accordingly, the letters stated that as of October 11, 2008, the three accounts would be converted to "share loss" accounts with certain restrictions on withdrawals, and all other credit union services would be suspended. (*Id.*)

Mr. Messick received a third letter regarding their joint account, and this letter explained that he needed to remove Mrs. Messick from the account or forfeit the same

-2-

services. (Tr. at 5-6.) Upon receipt of these letters, Mr. Messick called to inquire further about the impact on their accounts. (*Id.* at 7-8.) Mr. Messick spoke with Laura Williams, the individual who signed both letters. (Court Docs. 1-9 & 1-10.) During the first conversation, Mr. Messick and Ms. Williams had a brief discussion about why Appellants received these letters and what would happen to their accounts. (Tr. at 10.) Mr. Messick called back the next day to discuss what would happen with the accounts in greater depth. (*Id.* at 20.) Ms. Williams informed Mr. Messick that Sheila Messick had to be removed from the accounts to allow them to remain open with all the existing member services. (*Id.* at 8.) Ms. Williams explained that whenever a member causes a loss, Ascend could no longer provide the same services to that member, pursuant to credit union policy. (*Id.*) Mr. Messick told Ms. Williams that they were participating in a 100% plan to pay back the debt. (*Id.*) In response to this assertion, Ms. Williams informed Mr. Messick that they would still be losing interest on the money. (*Id.*) According to Mr. Messick, Ms. Williams volunteered information that the accounts could remain open if Appellants voluntarily repaid the lost interest. (*Id.* at 9.) According to Ms. Williams, Mr. Messick asked if there was any way to keep Mrs. Messick on the accounts, and Ms. Williams explained that the accounts could remain open as is if the lost interest was voluntarily repaid, but Ascend could not collect the interest. (*Id.* at 36.)

Based on this conversation, particularly Ms. Williams' discussion of the possible voluntary repayment of the interest that would be lost, Appellants filed a Motion of Debtors to Hold Laura Williams and Ascend Federal Credit Union in Contempt of Court For Violation of Title 11 USC § 362 Automatic Stay on October 3, 2008. (Court Doc. 1-7.) The

bankruptcy court held a hearing on this Motion on April 6, 2009. (Court Doc. 6.) After hearing testimony from Mr. Messick, Mrs. Messick, and Laura Williams, and argument by counsel for both parties, Bankruptcy Judge Cook found that the letters simply advised the Debtors of Ascend's policy regarding members who caused a loss. (Tr. at 70.) Judge Cook further found that nothing in the letters involved an attempt to collect on the debt, and since Mr. Messick initiated the contact at issue and asked about how to maintain the accounts, Ascend did not willfully violate the stay by discussing the possibility of reaffirmation. (*Id.* at 70-71.)

The Debtors have appealed the bankruptcy court's order denying their Motion and identify the following issues to be addressed on appeal:

> 1. Whether the Bankruptcy Court erred in finding and ruling that there was no violation of 11 U.S.C. § 362 where a creditor attempts to coerce a debtor to pay interest on a debt outside of a Chapter 13 bankruptcy plan and without the oversight of the Court or the debtor's attorney.
>
> 2. Whether the Bankruptcy Court erred in finding and ruling that the creditor did not unilaterally take or hinder the access of a Chapter 13 debtor to property of the estate without seeking the prior approval of the Bankruptcy Court.

(Court Doc. 3, Br. of Appellants at 1.)

## III.   ANALYSIS

The instant appeal arises out of the bankruptcy court's denial of the Debtors' Motion for Contempt. Appellants first challenge the bankruptcy court's finding that there was no violation of the automatic stay rules in 11 U.S.C. § 362(a)(1) or (6). Appellants also challenge the bankruptcy court's finding that Ascend and Laura Williams did not take or

-4-

hinder access to property of the estate in violation of 11 U.S.C. § 362(a)(3).  Each of these arguments will be addressed in turn.

### A.    The Bankruptcy Court Properly Found No Violation of 326(a)(1) or (6).

Appellants contend that Ascend and Laura Williams violated two provisions of 11 U.S.C. § 362, specifically:

> (a) [A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of–
>
>> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . .
>>
>> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . .

*Id.*  Appellants assert that the afore-described letters, combined with Mr. Messick's telephone conversations with Laura Williams, establish a violation of these provisions of the automatic stay and that the bankruptcy court improperly analyzed the relevant case law when it ruled otherwise.  (Br. of Appellants at 6-10.)

With regard to the two letters, the bankruptcy court found that there was no violation of the automatic stay because "all the creditor did in this case was advise the debtor why the account was to be closed . . . there is nothing in the letter that would indicate an attempt on the part of the Credit Union to collect the debt."  (Tr. at 70.)  The letter addressed to Mrs. Messick for her personal account reads as follows:

-5-

Dear Member:

> Credit union policy states that any member causing the credit union to incur a financial loss will no longer be eligible for any credit union services, with the exception of a share loss account which limits withdrawals to only one per quarter.
>
> Our records indicate that you caused such a loss, and as a result, you are no longer eligible for Star, ATM cards, safe deposit box rental, payroll deduction, direct deposit, credit cards, draft accounts, or any other credit union service. In addition, any lines of credit you had have been removed.
>
> If you have a share draft account, it will be closed on October 11, 2008, and any drafts presented for payment after that date will be returned marked "Account Closed."

(Court Doc. 1-9.) The second letter, sent to Mrs. Messick as the custodian of her childrens' accounts, includes an identical first paragraph and then states that she must remove herself as a joint owner to allow the accounts to remain active or they will be converted to share loss accounts as of October 11, 2008. (Court Doc. 1-10.) Ascend produced its Share Loss Policy during the hearing to provide the basis for sending out these letters. The Policy states that "[m]embers who have caused Ascend Federal Credit Union to suffer a loss . . . are not considered in good standing and, therefore, all credit union services may be denied." (Court Doc. 1-17.) Loss is defined in the Policy as including "*any* financial loss." (*Id.*) There is no dispute that this Policy was imposed on those who caused a loss through bankruptcy as well as other means.

The bankruptcy court found the case of *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81 (3d. Cir. 1988) instructive when it assessed these letters. The letter in *Brown* was similar to these letters in that it advised the debtor of the credit union's

policy. The *Brown* letter also included, however, a statement about the possibility of reaffirming the debt and maintaining services. *Brown*, 851 F.2d at 82. The United States Court of Appeals for the Third Circuit reversed the district court's ruling that the letter involved an attempt to collect the debt, finding that the letter was "mildly worded" and only referenced the possibility of a reaffirmation agreement. *Id.* at 84. The court found that the credit union could inform the debtor of its policy without violating the automatic stay. *Id.* at 85. The fact that this letter contained information about reaffirmation did not affect the court's holding; instead, the court "reject[ed] the proposition that a creditor violates section 362(a)(6) . . . merely by informing a bankruptcy petitioner that it will refuse to deal with her unless she reaffirms her debt." *Id.* at 86.

The *Brown* decision has been cited with approval in other factually similar cases in this Circuit. In *In re Callender*, 99 B.R. 378 (Bankr. S.D. Ohio 1989), the creditor sent a letter informing the debtors of the credit union policy regarding loss, but the letter also contained instructions about placing the creditor in another class of creditors in order to maintain services. *Id.* at 379. The *Callender* court agreed with the *Brown* court that such a letter was not coercive and was not an attempt to collect the debt that would violate the automatic stay. *Id.* at 379-80. Likewise, in *Matter of Hughes-Bechtol, Inc.*, 117 B.R. 890 (Bankr. S.D. Ohio 1990), the court stated:

> [T]his court recognizes that there are decisions which have held that, absent coercion or harassment, mildly worded correspondence which does not adversely impact on the estate, does not constitute an actionable violation of the automatic stay. Correspondence which is isolated and informational is less likely to result in a violation of the automatic stay than correspondence which is repetitive and requests payment. The resolution of such an issue is always a fact sensitive determination based on a consideration of the

totality of the circumstances.

*Id.* at 906 (citing *Brown* and other cases in support of its holding that "predominantly informational" materials did not violate the automatic stay); *see also Matter of Spaulding*, 116 B.R. 567, 571 (Bankr. S.D. Ohio 1990).

The Court acknowledges that there is one relevant case from a bankruptcy court in this district where the court took a different approach than that in *Brown*, but the Court finds that this difference was based on the dissimilar facts presented in each case. In *In re Walker*, 194 B.R. 165 (Bankr. E.D. Tenn. 1996), the creditor sent a letter that exclusively advised the debtor of the ability to reaffirm the debt and enclosed a separate reaffirmation agreement. The *Walker* court determined that there was a two-part test to assess a potential violation of the automatic stay under 362(a)(6) outlined in *In re Briggs*, 143 B.R. 438 (Bankr. E.D. Mich. 1992). First, the court should analyze whether the creditor's action "could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay." *Id.* at 453. Second, the court should assess whether the creditor's action "is contrary to what a reasonable person would consider to be fair under the circumstances." *Id.*

Applying this test, the *Walker* court found that the creditor's letter violated the automatic stay because the terms of the proposed reaffirmation agreement did not comply with the statutory requirements for such agreements. *Walker*, 194 B.R. at 169. Most importantly, the letters mandated a deadline for response that expired prior to the deadline stipulated to under the Bankruptcy Code for reaffirmation agreements in that case. *Id.* The court found that this deadline was likely coercive to secure reaffirmation. *Id.* In addition,

-8-

the agreement did not provide the proper language regarding rescission, did not indicate that it had to be affirmed by the debtor's attorney and approved by the bankruptcy court, and was essentially misleading and misrepresented the applicable law regarding the acceptance of such an agreement and the role of the debtor's attorney in that process. *Id.* at 169-71.

Appellants argue that their case is factually similar to *Walker* and, as such, the analysis in *Walker* should control rather than that of *Brown*. (Br. of Appellants at 8.) In fact, Appellants claim that the creditor's actions in this case are more egregious than those in *Walker*. (*Id.*) Appellants support this claim by pointing out that the creditor in *Walker* sent a copy of the reaffirmation materials to the debtor's attorney, and Ascend did not send the letters in this case to Appellants' attorney. (*Id.*) Furthermore, the parties in *Walker* stipulated that the debtors were not coerced or threatened by the letter. (*Id.*)

The Court disagrees that the relevant creditor actions in this case are more factually similar to those in *Walker* and further disagrees with the argument that the letters were more egregious than the one in *Walker.* As discussed above, *Walker* involved a letter that solely and extensively discussed reaffirmation. *Walker*, 194 B.R. at 166-67. Even though the parties agreed that the letter was not coercive or threatening and it was also sent to the debtor's attorney, the letter contained misleading statements about reaffirmation and neglected to comply with the applicable statutory requirements governing reaffirmation. *Id.* at 169-70. The letter was particularly coercive in regards to repayment of the debt because it required debtor action by an artificial deadline. *Id.* at 169. It was for these reasons–and these reasons alone–that the *Walker* court found a violation of the automatic

-9-

stay after applying the *Briggs* test. *Id.* at 169-70.

In *Brown*, the letter advised the debtor of the credit union's policy and briefly referenced the possibility of reaffirmation. *Brown*, 851 F.2d at 82. The Court finds the *Brown* letter much more similar to the letters in this action because Ascend's letters merely informed Appellants of its policy regarding loss. The letters did not mention reaffirmation at all and simply informed Appellants what would happen to the accounts due to this policy. (Court Docs. 1-9 & 1-10.) The fact that Ascend did not copy Appellants' attorney on the letters does not change the analysis because these letters were solely informational; unlike the letters in *Walker*, these letters did not require any action by Appellants that would necessitate attorney involvement. Simply put, the content of the letters in this action is very different from the content of the letters in *Walker*, and it was the content that led the *Walker* court to find a violation of the automatic stay.

The Court finds that the situation in *Brown* is more analogous to this situation. Apart from this analogy, however, the Court will independently apply the *Briggs* test to the facts of the instant case to determine if the contact by letter violated the automatic stay pursuant to 11 U.S.C. § 326(a)(6). Because there was no language in the letters about repaying the debt, the first prong of the *Briggs* test is not satisfied. There was simply nothing in these informational letters that would have any impact on Appellants' decision to repay the debt. The letters do not reference debt or repayment and do not threaten any action other than the conversion of checking accounts to share loss accounts. Furthermore, Ascend's action in sending the letters would appear fair to a reasonable person because these were standard letters, sent to members causing a loss pursuant to its standard procedure, and

were not sent exclusively to members who caused a loss in bankruptcy. (Court Doc. 1-17.) The letters were sent to any member who caused a loss through any means, and they contain very basic information about Ascend's standard policy. There is no indication that Ascend was acting differently or unfairly towards Appellants because of their bankruptcy petition. The Court finds that application of the *Briggs* test does not support a conclusion that these letters violated the automatic stay.

Appellants contend, however, that some of the surrounding circumstances still warrant a finding that these letters violated the automatic stay. (Br. of Appellants at 9.) Specifically, they assert that because Ms. Williams' title is "Collector," Appellants were given only ten days to comply with the letters, the letters were generated in the bankruptcy department but sent to the collections department for transmission to Appellants, and Appellants were invited to appear or call to address the situation, the underlying purpose of the letters was to collect the debt. (*Id.*) The Court does not find these assertions persuasive or supportive of the finding urged by Appellants.

As a preliminary observation, the Court notes that there was no language in the letters indicating that Appellants had an affirmative duty to respond or face a consequence such as forfeiture of the money in these accounts. The letter concerning the childrens' accounts does request that Mrs. Messick take care of removing herself as a joint owner of the accounts as soon as possible, but that is only to protect the accounts from losing credit union services. (Court Doc. 1-10.) Both letters state that the accounts will be converted to share loss accounts on October 11, 2008, and this would presumably occur without any action on the part of the Debtors. (Court Docs. 1-9 & 1-10.) Therefore, there was no deadline by which the Appellants were required to act before Ascend would take adverse

action.  Furthermore, neither of the letters in the record requests that Appellants call or appear to resolve the situation.[1]  (*Id.*)  The letters are informational only, advising of the loss of certain services–*not* the loss of money or the loss of the accounts themselves–if no action is taken.  (*Id.*)  There is nothing in either letter about repayment of the debt that would suggest an attempt at collection.  (*Id.*)  Finally, the fact that Ms. Williams' job title is "Collector" and that these letters were sent to the collection department for transmittal does not, in the Court's view, establish an intent to collect the debt when the letters are intended only to advise members of the policy and upcoming account change.

Appellants also contend that the letters, taken together with the two telephone conversations between Mr. Messick and Ms. Williams, indicate that the underlying purpose was to collect the debt and that this was a violation of 326(a)(1).  (Br. of Appellants at 9.) Appellants assert that they were essentially informed that there were only two ways to resolve the situation–either remove Mrs. Messick's name from the accounts or pay the lost interest.  (*Id.*)  Neither the letters nor the telephone conversations, however, presented Appellants with the type of choice characterized in their brief.  (*Id.*)  Appellants were informed through the letters that the accounts would be converted to share loss accounts pursuant to credit union policy for member losses.  This was standard procedure for Ascend, and it had the effect of revoking certain member services.  Appellants always had the option of remaining customers of Ascend with restricted accounts; should those restrictions be unacceptable to them, Appellants could choose a fourth option by closing

---

[1]     The Court is aware that there were three letters in all and the third was addressed only to Mr. Messick.  Appellants assert that one of the letters invited them to call or appear to "resolve the situation." (Br. of Appellants at 12.)  The Court assumes that this statement appeared on the third letter, but as it is not part of the record, it cannot be considered.

-12-

their accounts and taking their business elsewhere. Appellants attempt to characterize the communication of information during the telephone conversations as presenting the Appellants with only two equally difficult options, thereby suggesting a willful intent of Ascend to collect on the debt. The facts before the Court, however, do not support a finding that the information was presented in that fashion.

Of particular note to the Court is the fact that Mr. Messick called to inquire about the letters and Ms. Williams asserted during the hearing that Mr. Messick specifically asked if there was any way his wife could stay on the accounts. (Tr. at 36.) Although Mr. Messick's testimony is different in this regard because he does not indicate that he asked this question, the Court credits the following testimony of Ms. Williams:

> Q: Well, are you – are – are you going to offer him the opportunity to make the, the loss good?
>
> A: *If they ask in a bankruptcy*, we can tell them how they can.
>
> Q: Okay. Did you – did they ask? . . .
>
> A: . . . *When he asked me how to stop it*, I told him that anything that was paid outside of the bank, that they would have to pay anything that we were not getting paid in the bankruptcy voluntarily, but we would not collect on it.

(*Id.* at 44-45.) (emphasis added). In addition, Ms. Williams testified regarding a written report she created about the phone calls shortly thereafter. (*Id.* at 52-53.) In relevant portion, the report reads that "[Mr. Messick] [s]aid that he was going to talk with his attorney. Asked how to stop this. Told him that Ms. Messick would have to voluntarily repay, but we would not collect." (*Id.* at 52.) Therefore, the Court finds that it was only in response to Mr. Messick's question that the possibility of reaffirmation of the debt was raised by Ascend.

-13-

In *In re Harchar*, 393 B.R. 160 (Bankr. N.D. Ohio 2008), the court acknowledged that the "normal paradigm for a stay violation" involved the creditor contacting the debtor. *Id.* at 185. In *Harchar*, the debtor contacted the IRS, the creditor, to inquire about their tax refund, and the court found that the initiation of contact by the debtor weighed against finding that the IRS was attempting to coerce the debtors to pay their debt. *Id.* at 185. Similarly, in this case, Appellants were not coerced into action by statements of Ascend or Laura Williams. Had Appellants taken no action whatsoever upon receipt of the letters, their money would have been transferred to share loss accounts. No other detrimental action would have occurred to the funds in those accounts. Appellants, however, took affirmative action by calling Ascend to decipher the meaning of the letters. Upon explanation of the policy, Mr. Messick asked Ms. Williams how Mrs. Messick could remain on the accounts. The response by Ms. Williams to this affirmative inquiry does not establish a coercive action to encourage repayment or a willful intent by Ascend to collect on the debt.

Applying the *Briggs* test to these telephone conversations does not change the result. Mr. Messick was informed that Mrs. Messick needed to be removed from the accounts for the services to remain intact. He specifically asked about other options and was told that paying the interest voluntarily would restore the accounts. This response, although it may have impacted Appellants' decision to pay the debt, was not a creditor action that would indicate any intent to coerce the debtor to repay the debt under the first prong of *Briggs*. To find otherwise would be essentially to rule that no creditor could ever answer a direct question from a debtor if the answer would state anything about reaffirmation; no creditor could even discuss the possibility of reaffirmation without

-14-

potentially violating the automatic stay. As for the second prong, the information communicated by Ms. Williams to Mr. Messick during the telephone conversation would not be unfair to a reasonable person. During the hearing, Appellants seemed to be attempting to urge that Mr. Messick's subjective belief about what would happen to the accounts imputed a wrongful intent on Ascend to collect on the debt or otherwise engage in coercive action to encourage repayment.[2] This, however, is not the applicable legal

---

[2]     Mr. Messick testified as follows:

A: . . . I was concerned about my money and, you know, I didn't want them to take it away. 'Cause the way those letters read, they was going to shut our accounts out. I didn't know what was going to happen with my money.

(Tr. at 10.)
. . .

Q: And she [Laura Williams] told you nothing was going to happen to your money?
A: Till October the 11th, I think it was. She said it was okay until that October the 11th and then they would be shutting down accounts.
Q: And then the money in that account would go into your savings account?
A: I don't recall her telling me that.
Q: Well, that's what the letters say.
A: I recall her telling me that, that she would shut the accounts down. They would shut them out, close them out.
Q: And did she not tell you that they would then go into the savings account?
A: I don't recall her telling me that.

(Tr. at 19.)
. . .

A: . . . Because that's the way they explained to me that if I didn't take my wife's name off all those accounts, that they would shut them down, anyway.
Q: Right.
A: And I felt that was unfair.
Q: All right. Now on the three accounts she was on, the two children and her share account, her letters say that those were going to put into a savings account, correct?
A: I think so.
Q: Okay. And on your account, where she was a joint signer to it, it said if she was taken off the account, then you could have all your Credit Union privileges, maintain your checking account –
A: It did.
Q: – just as always, correct?
A: It, it did.
Q: Okay.

-15-

standard.  The fact that Mr. Messick did not fully understand what would happen with his accounts and felt that Ascend's policy was unfair does not mean a reasonable person would find this exchange to be unfair.  Mr. Messick called Ascend for clarification on the letters.  Ascend's representative, Ms. Williams, explained the letters and answered Mr. Messick's questions.  The Court finds that there is nothing in the conversation that would be unfair to a reasonable person, particularly in the context of assessing a possible violation of the automatic stay provisions in 11 U.S.C. § 362(a)(1) and (6).

The Court simply cannot find that the facts support a violation of the automatic stay. The bankruptcy court found that the letters "merely advised the debtor of the Credit Union's rights to cease doing business with the debtors and advised the debtors that their account would be closed and that the creditor would not obtain the funds but, rather, would transfer the funds to the share loss account."  (Tr. at 70.)  This factual finding is not clearly erroneous.  The Court also agrees with the bankruptcy court's conclusion that debtor-initiated contact that revealed basic information about reaffirmation, in response to the debtor's question, does not support a violation of the automatic stay.  (*Id.* at 71.) The Court therefore finds that the bankruptcy court properly found that Ascend did not violate the automatic stay.

### B.    The Bankruptcy Court Properly Found No Violation of 326(a)(3).

Appellants also contend that Ascend and Laura Williams violated the automatic stay

---

A: I think so.
Q: But instead of removing her from the account you chose to close your account?
A: Yes, sir.  And I explained to you that that was both of our accounts, you know, and I felt that was unfair that they would force us to do that and I felt like they were, they're forcing me to do it.  Either take my wife off, or, "We'll shut you down," is the way I felt.

(Tr. at 22-23.)

-16-

provision of 11 U.S.C. § 362(a)(3), which imposes a violation for "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *Id.* Appellants assert that checking accounts and the money within are part of the bankruptcy estate and Ascend's action of revoking service to these accounts was an exercise of control over this property. (Br. of Appellants at 11-12.) According to Appellants, this exercise of control, coupled with Ascend's alleged attempt to collect the loss in the letters and telephone conversations, resulted in a violation of the automatic stay. (*Id.* at 12.) The case Appellants cite in support of this proposition, however, is quite distinguishable from the facts in this action. In *In re Patterson*, 967 F.2d 505 (11th Cir. 1992), the creditor did not just notify the debtor that they would be revoking credit union services; instead, the creditor also froze the money in the debtor's account immediately upon learning of the bankruptcy filing and filed a proof of claim indicating a lien on the money in the account. *Id.* at 507-08. The *Patterson* court specifically explained that the freeze on the account was what constituted an exercise of control under 362(a)(3) because it deprived the debtors of control over the funds and instead gave the creditor exclusive control. *Id.* at 511. Furthermore, the court found a violation of 326(a)(6) because the creditor froze the accounts, suspended the credit union's services, *and* attempted to coerce the debtors to reaffirm the debt. *Id.* at 512.

These actions taken together were sufficient to establish a violation in *Patterson*, but the court distinguished other cases that did not involve a similar series of egregious actions. Specifically, the court distinguished *Brown* and *Callender* because they did not involve a freeze of accounts and only involved letters informing the members of the

creditor's loss policy and referenced reaffirmation. *Id.* at 512-13. The court acknowledged that "enforcement of [the] policy was not found coercive in those cases because, unlike this case, those credit unions enforced the policy without regard to whether the member had filed bankruptcy." *Id.* at 513. The same facts in *Brown* and *Callender* which were found to distinguish them from *Patterson* are present in this case. Ascend did not freeze the funds in Appellants' accounts and it enforced the share loss policy regardless of how the loss occurred. Exclusive control over, and access to, the funds in these accounts remained with Appellants at all times. Had Appellants taken no action, the money would have simply been converted over to a share loss account with certain restrictions on withdrawal. There is no suggestion that Ascend ever took any of the money from these accounts or intended to collect the debt from these accounts.

The Court finds that *Patterson* does not support the assertion that Ascend exercised control over property of the estate merely by revoking member services on these accounts. Furthermore, although Appellants claim that this action can support a violation of the automatic stay when it is coupled with coercion to pay the debt, Appellants have failed to demonstrate that Ascend engaged in coercive action to collect on Appellants' debt, either by sending letters advising Appellants of its policy or through the phone conversations with Mr. Messick. The facts do not support a finding of coercion in any of these communications. The Court concludes that the bankruptcy court properly found that there was no violation of 11 U.S.C. § 326(a)(3).

## IV.    CONCLUSION

Having reviewed the bankruptcy court's factual findings for clear error and legal

conclusions *de novo*, the Court finds no error.  Accordingly, the bankruptcy court's April 7, 2009 Order [Court Doc. 1-19] denying the Debtors' Motion is **AFFIRMED**.  The Clerk shall close the case.

**SO ORDERED** this 29th day of January, 2010.

_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE